DAVID OPPENHEIMER,

        Plaintiff,                   **DEFENDANTS' PRETRIAL BRIEF**

   v.

WILLIAM STACEY MOORE and THE ACL LLC,

        Defendants.

## BACKGROUND

ACL LLC is a corporate Defendant in this action, and Defendant William Stacey Moore is ACL's managing member. This dispute arises out of marketing for an ACL tournament to be held in 2016 at Harrah's Cherokee Hotel and Casino, located on the Qualla Boundary of the federally recognized Eastern Band of Cherokee Indians. The Plaintiff took numerous photographs of the interior of the Casino. These were copyrighted through the United States Patent Office and posted on the Internet. On or about November 18, 2015, ACL uploaded a photograph of the interior lobby of the venue to be used on the ACL website. Defendant Response to Interrogatory 4. While memory understandably fades from an event that occurred almost seven years ago, this photograph came to ACL either directly from business contacts at Harrah's Cherokee or a Google image search. Defendant Response to

Interrogatory 3. The photograph was removed no later than December of 2016 after Defendants received a letter from Plaintiff's attorney complaining of Defendants' unlicensed use of the photo. Defendants Response to Interrogatory 4.

This photograph was originally taken by David Oppenheimer on or about February 16, 2014. Mr. Oppenheimer has provided no documentation of permission at any time by the Eastern Band of Cherokee or Harrah's Cherokee for commercial photography on its grounds or inside its facilities. Nevertheless, Mr. Oppenheimer claims he registered this photograph with many other similar Harrah's interior photographs with the U.S. Copyright office. These registrations were in addition to the thousands of other photographs he has registered with the U.S. Copyright Office.

As a professional copyright plaintiff, Mr. Oppenheimer pays for complex automated programs to scour the web for his 20,000 to 30,000 plus copyrighted photographs, in order to identify instances of potential infringement which he can monetize. Oppenheimer Deposition, P. 32, 9-21. Utilizing this service, Oppenheimer hides in wait for any of his tens of thousands of easily accessible photographs to be improperly published by third parties. These improper publications may be caused by ignorance, carelessness, or otherwise done inadvertently, or sometimes intentionally. His scheme is to target those with sufficient money in order to settle claims at a cost just below that of defending a federal copyright suit. This cost scale shifts based on the wealth of defendants to be tapped, not the market value of the photograph nor actual damages, if any. He has often been successful before filing suit

2

or shortly after, as most defendants cave to his demands and pay him rather than go to court. These Defendants have not.

On Sept 27, 2018, Oppenheimer's attorney sent Mr. Moore an email alleging copyright infringement. Complaint, ¶ 13. Despite the photograph already being removed from ACL's regular public website, Plaintiff's software-based search somehow discovered copies on ACL's backup server that ACL itself was unaware even existed. ACL quickly and willingly removed the digital copies of the photograph saved on the backup server. Moore Deposition, p. 60, 6-25; p. 61, 1-5. After some settlement discussions, this suit was filed on January 17, 2019. Defendants filed an Offer of Judgment pursuant to Rule 68 of the Fed. R. Civ. P. on December 13, 2019, for a total of $4,000. Plaintiff did not respond to that offer before expiration under the rule, so it is deemed not accepted.

Plaintiff next moved for Summary Judgement. Defendants responded, asserting various affirmative defenses. The Court granted Plaintiff's motion for summary judgement on some affirmative defenses but denied summary judgment on Defendants' copyright misuse-based Fair Use and Unclean Hands arguments.

## LEGAL ISSUES

I. **DEFENDANTS USE OF THE COPYRIGHTED WORK IS PROTECTED DUE TO PLAINTIFF'S MISUSE OF THE COPYRIGHT UNDER THE "UNCLEAN HANDS" AND "FAIR USE" DOCTRINES.**

Under both the doctrines of unclean hands and fair use, enforcement of Plaintiff's copyright for this photograph is against public policy and the intent of the legislature.

3

The "fair use" of copyrighted material is not considered copyright infringement. 17 U.S.C .§ 107. "Fair use" is a statutory term, which generally covers the use of copyrighted materials for "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." Id. Fair use is, however, not limited to those examples. See Harper & Row Publishers, Inc. v. Nation Enter., 471 U.S. 539, 552–53 (1985) (fair use analysis "must always be tailored to the individual case.")

"The fair use doctrine 'permits and requires courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" Seltzer v. Green Day, Inc., 725 F.3d 1170, 1175 (9th Cir. 2013) (quoting Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577 (1994)). To determine whether a defendant's use of copyrighted material is "fair," the court is required to analyze the use in accordance with four non-exhaustive factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

Most importantly for our purposes, the fourth factor, "the effect of the use on the potential market for or value of the copyrighted work," the Supreme Court described this as "the single most important element of fair use…." Harper & Row Inc., 471 U.S. at 562. The focus here is not "whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but [upon]

4

whether the secondary use usurps the market of the original work." <u>A.V. ex rel. Vanderhye</u>, 562 F.3d at 643 (citations omitted, bracketing in the original). Otherwise stated, the plaintiff must show that its potential customers will no longer be inclined to purchase the plaintiff's work due to the infringement. <u>See</u> <u>id</u>.

Likewise, the doctrine of unclean hands can excuse an actual infringement. Indeed, this deeply rooted equitable defense "applies when the plaintiff engaged in conduct related to its claim against the defendant that was inequitable and injurious to the defendant." <u>Great E. Resort Corp. v. Virtual Resort Sols., L.L.C.</u>, 189 F. Supp. 2d 469, 480 (W.D. Va. 2002). As the Supreme Court articulated,

> The guiding doctrine in this case is the equitable maxim that 'he who comes into equity must come with clean hands.' This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.
>
> This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.' Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor.

<u>Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.</u>, 324 U.S. 806, 814-15 (1945) (internal citations omitted).

Objectively speaking, Plaintiff's actual gainful profession is that of a professional copyright plaintiff and the primary stream of income for this and all his photographs is the profit to be had by litigation for infringement. <u>See</u> <u>Righthaven,</u>

LCC v. Jama, No. 2:10-CV-1322 JCM LRL, 2011 WL 1541613, at *4 (D. Nev. Apr. 22, 2011). Notably, Plaintiff has brought hundreds of infringement suits nationwide and pays a monthly service to scour the web for hits on any of his over 20,000 plus copyrighted photos. Such former copyright infringement defendants include non-profit medical providers. Oppenheimer Deposition, p. 73, 18-24. The vast majority of the Plaintiff's income derived from his photography is by way of litigation or threats of litigation for copyright infringement. Because Defendants' use of this photograph in describing a venue a) does not interrupt Plaintiff's actual primary market of "copyright trolling"[1], there has been no harm to its actual market value of the copyrighted work, and b) does not usurp the markets, if any, for the copyrighted image.

This idea may be best understood as an economic formula.[2] Due to the presence of an artificially set statutory value of copyrighted materials, a new legal claim market value is created which often, as here, is very distant from the traditional market value. Plaintiff's copyrighted images have "elastic value", so to speak, based not necessarily on traditional variables like artistic creativity and merit or supply/demand of marketplace competitors, but rather on the maximum statutory

---

[1] "[C]opyright trolling because of the opportunistic way in which they seek to monetize assertions of infringement."
See generally, Matthew Sag, Jake Haskell, Defense Against the Dark Arts of Copyright Trolling, 103 Iowa L. Rev. 571, 573 (2018).

[2] For modern scholarship on economic modeling for predictive litigation behavior, see e.g., Sergio J. Campos et. al., Deterrence Effects Under Twombly: On the Costs of Increasing Pleading Standards in Litigation, 44 Int'l Rev. L. & Econ. 61 (2015); John Bronsteen, Some Thoughts About the Economics of Settlement, 78 Fordham L. Rev. 1129 (2009).

damages amount obtainable for copyright infringement, less the various costs of copyright enforcement, with that total modified by the likelihood of success for the claims. See below.



The scheme is not an overly complex one, especially for its lucrative results. When a infringer, however hapless their use might be, has sufficent resources to warrant the cost of legal enforcement and risk of success, the trap springs and begins the threats of litigation with offers to settle for absuredly inflated values relative to actual competitor options. Due to statutory damages and the often available argument to copyright plaintiffs of "intentional" infringement, these cases have decent theoretical value. Such copyright trolls can become "cash cows" for the attorneys who, sometimes ethically and sometimes not, assist in the perpetuation of these schemes and are more likely to accommodate in costs to maintain such mutually beneficial relationships. In that sense, Plaintiff's true market value for his generic photos is primarily as copyright infringement bait for statutory damages. Because Defendants' use of the image has no effect on the above described "elastic value" of images as bait, Plaintiff is both acting against public policy and has suffered no damages to the images primary market value.

As for the secondary and more traditional market for the photograph itself, as previously mentioned. the Tribe which operates the casino would have no benefit from

7

acquiring a license where they are immune from suit for unlicensed use. The photo itself is of the interior of a hotel lobby and was used by Defendants in marketing the venue of an event. Plaintiff has provided no documentation of market value of comparable hotel lobby photos.

The same underlying concept from the fourth prong of fair use, in combination with federal public policy interests, supports Defendants' overarching "misuse of copyright" defense. See, Lasercomb Am., Inc. v. Reynolds, 911 F.2d 970, 977-979 (4th Cir. 1990) ("Having determined that "misuse of copyright" is a valid defense . . . [t]he question is whether Lasercomb is using its copyright in a manner contrary to public policy, which question we have answered in the affirmative."); Altmayer-Pizzorno v. L-Soft Int'l, Inc., 302 F. App'x 148, 156 (4th Cir. 2008) (citing Lasercomb) ("The Fourth Circuit expressly recognizes misuse of copyright as an equitable defense to a suit for copyright infringement.") Upholding the validity of Plaintiff's entrepreneurial copyright plaintiff scheme—disguised as a professional photographer company—would run counter to the legislative interest in copyright of protecting creativity and permitting derivative works and the public policy of economic development. Plaintiff's professional manipulation of well-intended legislation to leach off legitimate businesses makes a mockery of the legislation's purpose and spirit, to the detriment of all but Plaintiff's wallet, and Plaintiffs come to the table with unclean hands.

## II. PLAINTIFF'S ACTUAL DAMAGES ARE DE MINIMIS AND STATUTORY DAMAGES SHOULD BE MINIMAL UNDER RELEVANT DETERMINING FACTORS.

a. **Actual Damages**

Actual damages mean the amount of money adequate to compensate the copyright owner for the reduction of the market value of the copyrighted work caused by the infringement. The reduction in the market value of the copyrighted work is determined based upon the amount a willing buyer would have been reasonably required to pay to a willing seller at the time of the infringement for the use made by defendant of plaintiff's work. If the copyrighted work was reduced in market value by reason of Defendants' infringement, then the actual damages are the change in the amount that a willing buyer would be reasonably required to pay to a willing seller at the time of the infringement for the use made by Defendants of Plaintiff's work.

In this matter, the primary and most lucrative market value of the image as copyright bait is unaffected.

b. **Statutory Damages**

Statutory damages are governed by 17 U.S.C. § 504: Remedies for Infringement, Damages and Profits. In determining the appropriate amount to award, the jury may consider the following factors, as articulated by the local rules of the seventh circuit:

- - the expenses that Defendant saved and the profits that he earned because of the infringement;
- - the revenues that Plaintiff lost because of the infringement;
- - the difficulty of proving Plaintiff's actual damages;
- - the circumstances of the infringement;

9

- - whether Defendant intentionally infringed Plaintiff's copyright; and
- - deterrence of future infringement.

### III. WILLFULNESS

Pursuant to § (c)(1) of the Statute, Plaintiff's damage can be not less than $750 and no more than $30,000. However, under § (c)(2) of the Statute, the Court may consider whether Defendants' acts were willful. If the Court so finds, then the Court may adjust the damage award up to $150,000.

Although the Copyright Act does not define willful infringement, in making the determination of statutory damages, considerations include willfulness, the continuation of the infringement after notice or knowledge of the copyright, or reckless disregard of the copyright, the effect of the defendants' prior or concurrent copyright infringement activity, and whether profit or gain was established. 38 Fed. Jury Prac. & Instr. § 160:92 (6th ed.) In this case Defendant Moore testified that he was aware of the law protecting the use of copyrighted material, including photographs, but that he had in fact paid licensing fees prior to this occasion for use of photographs, though usually he obtained use permission at no charge. Neither Defendants nor Defendant ACL's employees noticed Plaintiff's copyright and simply made a mistake in using it. As soon as they were notified, they removed the photograph from Defendant's website. Defendants were unaware that the copyright was stored on a server because Defendants were unaware of the server's existence. Once the server was located, the photograph was also removed. In that connection, it is doubtful that anyone aside from the Plaintiff was able to locate or view the

10

photograph on the server. There is no evidence that the use of the photograph elicited any attendance at the cornhole event, and Defendants made little, if any, profit from the event. When Defendants were notified of the situation, they offered to purchase a license or to pay some amount to the Plaintiff as compensation. The sums Plaintiff demanded were outrageous and Defendants filed an Offer of Judgment for $4,000.00 which was refused by non-acceptance. Should this matter come before the Court, Defendants contend that the Court should find that their actions were not willful. Should the Court find otherwise, the Defendants contend that the Court should not award Plaintiff any sum in excess of that awarded by the jury, or, in any event, only a de minimis increase.

Dated: October 14, 2022

**VAN WINKLE, BUCK, WALL, STARNES & DAVIS, P.A.**

*s/ David M. Wilkerson*
David M. Wilkerson
NC Bar No: 35742
*Attorney for Defendants*
The Van Winkle Law Firm
11 North Market Street
Asheville, North Carolina 28801
Phone: (828) 258-2991
Fax: (828) 257-2767
dwilkerson@vwlawfirm.com